Leon Samson by Barnet Samson his Guardian ad Litem, Plaintiff, *v.* The Trustees of Columbia University in the City of New York, Defendant.

(Supreme Court, New York Special Term, September, 1917.)

Injunctions — when denied — Columbia University — resistance to draft ordained by lawful authority.

> Where a student at Columbia University, in the course of a public address in which he counseled resistance to the draft ordained by lawful authority, said " We have no love for the kaiser; but as much as we hate the German kaiser we hate still more the American kaiser," and, further, that there had been draft riots in the Civil War but there would be a draft revolution during the war of 1917, and a report of the meeting at which the address was made appeared in the public press the next day, a motion for an injunction *pendente lite* in an action to procure a decree requiring the university to allow him to continue in the institution as a student after notice that he would not be permitted to receive any further instruction therein will be denied.

Motion for an injunction *pendente lite.*

Doubin & Liebman (Louis B. Doubin, of counsel), for plaintiff.

John B. Pine, for defendant.

Mullan, J.    The plaintiff brings this action to procure a decree requiring Columbia University to allow him to continue in that institution as a student, and he makes this motion for the relief he seeks *pendente lite.*    At some time prior to September 26, 1916, the date not being stated in the papers, the plaintiff, while a student at the College of the City of New York, was suspended by the faculty thereof for creating a disturbance at a general meeting of the students of that college, on the occasion of an address by General Leonard Wood on the subject of preparedness.    Just

what he did does not appear.  He later applied to the defendant university for admission as a student, and he was so admitted on September 26, 1916, entering the upper division of the sophomore class.  In February, 1917, he was graduated from the sophomore class into a junior class, and at the close of the academic year of 1916–1917 he was a member of the junior class, having successfully completed his studies in the lower division of that class.  After the conclusion of that academic year, and on June 14, 1917, the defendant, through its acting dean, notified plaintiff that he would not be permitted to receive any further instruction at Columbia University.  The reasons assigned by the defendant for its refusal to allow the plaintiff to continue as one of its students are that on June 11, 1917, the plaintiff made an address at an " Emma Goldman " meeting, held in the Royal Lyceum, No. 10 West One Hundred and Fourteenth street, in which he said: " We have no love for the kaiser; but as much as we hate the German kaiser we hate still more the American kaiser;" that he also said on that occasion that there had been draft riots in the Civil War, but that there would be a draft revolution during the war of 1917, and that the following report of the meeting was published in the New York *Times* of June 12, 1917: "At 8 o'clock Sampson arose to open the meeting.   *   *   *   In his opening harangue he devoted much of his time to the Workmen's and Soldiers' Council of Russia.  He announced that he was about to organize such a council to run things in the United States.   *   *   *   He said the time had come when ' we are going to refuse to stand up and shoot down our brothers.'  The war, he declared with great solemnity, is a ' dollar war,' and he reached his climax by prophesying a draft riot which would be more than a riot. ' It's going to be a draft revolution,' he said.  He is

also quoted as saying: 'As much as we hate the German kaiser, we hate still more the American kaiser.' " and that a similar report of that meeting was published in the New York *World* of June 12, 1917. The plaintiff in his replying affidavit alleges that the newspaper account of his speech was a garbled version, but it is significant that he makes no denial that the published account correctly represented the substance and spirit of his address, and that he does not state what it was he did say on the occasion in question. The defendant urges three grounds for the defeat of the plaintiff's motion: *First,* that as the plaintiff had completed his studies for the academic year for which he had been admitted, his contract with the university had expired; *second,* that plaintiff was admitted only on probation and upon the express understanding that he " should not engage in any activities or take part in any movement which would involve the university in undesirable notoriety;" and, *third,* that the refusal of the university to allow the plaintiff to continue as a member of its student body was a proper exercise of the discretion and disciplinary power necessarily vested in an institution of learning, and actually conferred by its charter upon the defendant, and controlled by by-laws of its making that I deem it unnecessary to refer to in detail. Considering these grounds in the order stated, I incline to the view that while in a strict sense a student contracts with an institution of learning for only a given part of a course, usually measured by the period of an academic year, the circumstances frequently permit of the implication that the institution had obligated itself — subject, of course, to changes of plan, curriculum and the like — to permit a student in good standing to continue the particular course for which he has entered, upon payment of the necessary fees and compliance with other

reasonable requirements. At least, it would seem that a strong argument may be made for such a rule of construction. But as I think the relief the plaintiff here seeks must be denied upon another ground I shall not pursue further the inquiry upon this head, but shall resolve the doubt in the plaintiff's favor for the purpose of this motion. Coming to the defendant's second ground of opposition, it is to be noted that the statement of the university's secretary upon the subject contains nothing more than the bare allegation that the plaintiff was admitted on probation, as hereinbefore mentioned, without any supporting or evidentiary facts, and that the plaintiff flatly denies that there was any agreement or stipulation whatsoever upon the subject of his future conduct. If I considered a determination of that question of fact necessary to the decision here, I should ask for further affidavits, but I have concluded to decide the motion upon the third ground, namely, that dealing with the disciplinary powers of the defendant over its student body. Assuming, then, that the plaintiff is correct in his assertion that a contractual relationship subsisted between him and the university after the close of the past academic year, I think it is plain that it was one of the implied terms of the agreement that the plaintiff would comport himself in such manner as not to destroy or interfere with the discipline, good order and fair name of the university which had admitted him as one of the students. As was said by Mr. Justice Patterson, in the case of *Goldstein* v. *New York University,* 76 App. Div. 83: "Obviously and of necessity there is implied in such contract a term or condition that the student will not be guilty of such misconduct as would be subversive of the discipline of the college or school, or as would show him to be morally unfit to be continued as a member thereof. The power of

suspension or expulsion of students is an attribute of government of educational institutions.'' The question for determination here is, therefore, Has the plaintiff been guilty of such misconduct as to disentitle him to be continued, or has he shown himself to be morally unfit to be continued, as a member of the student body of the defendant? '' Misconduct '' perhaps refers more particularly to demeanor within the walls of the institution or in connection with the ordinary activities of student life, and of improper practices by the plaintiff in that regard there is no claim made here. But the implied stipulation of good conduct, variable in its meaning and incapable of precise definition as that term must always be, is not, I think, to receive the restricted construction that the student's conduct may be the subject of control only in so far as it relates to his actions in his capacity and status of student. The term '' morally unfit,'' as used by Mr. Justice Patterson, must be given the broader meaning and should be construed as comprising any conduct that may interfere with or injure the university, or lessen its proper control over its student body, or impair its influence for good upon its students and the community. Viewing the matter in that light, I think it will be conceded that the duty of an institution of learning is not met by the mere imparting of what commonly goes under the name of knowledge. By the common consent of civilized mankind through the ages, not the least important of the functions of a school or college has been to instil and sink deep in the minds of its students the love of truth and the love of country. Is such conduct as that of the plaintiff calculated to make it more difficult for the defendant university to inculcate patriotism in those of its student members — if there be such unfortunates — who are without it? Does language of the sort used

by the plaintiff at public meetings — for I assume that he is in substance correctly quoted — make him a real or potential menace to the morale of the defendant's student body and a blot on the good name of the famous and honored university whose degree he seeks? There may be two answers to those questions, but I see only one. We are a tolerant people, not easily stirred, prone to an easy-going indulgence to those who are opposed to the very essentials and vitals of our organized social life, but there must of necessity be a limit somewhere to the forbearance that can with safety be extended to the forces of destruction that hide behind the dishonestly assumed mask of the constitutional right of free speech. To attempt to state in general terms the difference between an honest and a dishonest exercise of the wholesome right of free speech that our Constitution so completely and properly protects would be as vain as it would be unprofitable here. In some cases, in many cases perhaps, reasonable men would differ. But in some cases reasonable men could not differ, and I think we are dealing with such a case here. To counsel resistance to the draft ordained by lawful authority in accordance with our form of government is as culpable as it is cowardly; and one who does so is doing the work of the enemy without — thus far, at least — incurring the risks and braving the dangers that are the accepted lot of an enemy who is recognized as such because he has the courage openly to avow his true allegiance. Whether the plaintiff's conduct comes within the accepted definitions of sedition or treason, I have not concerned myself to inquire. It suffices me that he and his kind are attempting to make unsuccessful a war that this our country has declared and is waging. That it should be made impossible for such a person to remain at liberty to make common cause

with our enemy is the view of many, but that consideration is beyond the scope of this inquiry. What I have to do with is the question of whether the plaintiff's continuance at Columbia University, with the inevitably close contact in which that would place him with impressionable young men of his own age who might thus be inoculated by him with the poison of his disloyalty, is likely to constitute a menace to the university. I think it would, and that the defendant was well within its rights in refusing further to extend to him its privileges and opportunities.

Motion denied, with ten dollars costs.