*591 OPINION OF THE COURT
Arnold Guy Fraiman, J.
This is an action by the Islamic Republic of Iran (the Government of Iran), against Ashraf Pahlavi, the sister of the late Mohammed Reza Pahlavi, formerly the Shah of Iran. As the Shah, Pahlavi was the head of the government of the Empire of Iran. By its complaint, described more fully below, plaintiff seeks equitable relief and money damages for defendant’s alleged violation of fiduciary obligations imposed upon her by the law of Iran. In essence, it is alleged that defendant and the Shah diverted to their own use funds and property belonging to the government and people of Iran. Defendant moves to dismiss the complaint on the ground that the court lacks jurisdiction of the subject matter of the complaint because the action involves political questions which are not subject to judicial resolution; on the further ground that plaintiff comes into court with “unclean hands”; and finally, on the ground of forum non conveniens. Consideration of these defenses requires a review of the events leading up to this litigation.
On January 16, 1979, following a period of political unrest, the Shah left Iran. In February, 1979, the Empire was overthrown and was replaced by the present government which is the plaintiff in this action. Upon the Government of Iran’s accession to power and continually thereafter, representatives of the government publicly called for the return of the Shah and members of his immediate family to Iran to stand trial for alleged crimes against the Iranian people; for the execution of the Shah and his family; and for the return to Iran of property the Shah and his family had allegedly stolen.
On October 22, 1979, the Shah was admitted to the United States from Mexico for medical treatment. On November 4, 1979, the United States Embassy in Tehran was taken over by militant Iranian students and 66 Americans were seized as hostages. The students announced that the imprisoned Americans would be held until the United States returned the Shah to Iran for trial. The Government of Iran thereafter indorsed the actions of the students and indicated that the United States would not only have to return the Shah to Iran, but must also return all of his *592 wealth in order to obtain the release of the hostages. Fifty-two of the original 66 hostages remained prisoners in Iran for a total of 444 days. They were released on January 20, 1981, pursuant to an Agreement entered into by the Government of Iran and the United States. The Agreement was embodied in two documents dated January 19, 1981, bearing the collective title, “Declarations of the Government of the Democratic and Popular Republic of Algeria” (the Agreement).
Paragraphs 12,14 and 15 of the Agreement are relevant to the present action. They provide as follows:
“12. Upon the making by the Government of Algeria of the certification described in Paragraph 3 above, the United States will freeze, and prohibit any transfer of property and assets in the United States within the control of the estate of the former Shah or any close relative of the former Shah served as a defendant in U. S. litigation brought by Iran to recover such property and assets as belonging to Iran. As to any such defendants, including the estate of the former Shah, the freeze order will remain in effect until such litigation is finally terminated. Violation of the freeze order shall be subject to the civil and criminal penalties prescribed by U. S. law.
* * *
“14. Upon the making by the Government of Algeria of the certification described in paragraph 3 above, the United States will make known to all appropriate U. S. courts, that in any litigation of the kind described in paragraph 12 above the claims of Iran should not be considered legally barred either by sovereign immunity principles or by the act of state doctrine and that Iranian decrees and judgments relating to such assets should be enforced by such courts in accordance with United States law.
“15. As to any judgment of a U. S. court which calls for transfer of any property or assets to Iran, the United States hereby guarantees the enforcement of the final judgment to the extent that the property or assets exist within the United States.”
On January 19,1981, President Carter issued Executive Order No. 12284 (46 Fed Reg 7929), implementing the *593 foregoing provisions of the Agreement. The order provided in relevant part as follows:
RESTRICTIONS ON THE TRANSFER OF PROPERTY OF THE FORMER SHAH OF IRAN
“By the authority vested in me as President by the Constitution and statutes of the United States, including Section 203 of the International Emergency Economic Powers Act (50 U.S.C. 1702), Section 301 of Title 3 of the United States Code, Section 1732 of Title 22 of the United States Code, and Section 301 of the National Emergencies Act (50 U.S.C. 1631), in view of the continuing unusual and extraordinary threat to the national security, foreign policy and economy of the United States upon which I based my declarations of national emergency in Executive Order 12170, issued November 14, 1979, and in Executive Order 12211, issued April 17, 1980, in order to implement agreements with the Government of Iran, as reflected in Declarations of the Government of the Democratic and Popular Republic of Algeria dated January 19,1981, relating to the release of U. S. diplomats and nationals being held as hostages and to the resolution of claims of United States nationals against Iran, and to begin the process of normalization of relations between the United States and Iran, it is hereby ordered that as of the effective date of this Order:
“1-101. For the purpose of protecting the rights of litigants in courts within the United States, all property and assets located in the United States within the control of the estate of Mohammed Reza Pahlavi, the former Shah of Iran, or any close relative of the former Shah served as a defendant in litigation in such courts brought by Iran seeking the return of property alleged to belong to Iran, is hereby blocked as to each such estate or person until all such litigation against such estate or person is finally terminated.
* * *
“1-104. The Attorney General of the United States having advised the President of his opinion that no claim on behalf of the Government of Iran for recovery of property of the kind described in Section 1-101 of this Order should be *594 considered legally barred either by sovereign immunity principles or by the act of state doctrine, the Attorney General is authorized and directed to prepare, and upon the request of counsel representing the Government of Iran to present to the appropriate court or courts within the United States, suggestions of interest reflecting that such is the position of the United States, and that it is also the position of the United States that Iranian decrees and judgments relating to the assets of the former Shah and the persons described in Section 1-101 should be enforced by such courts in accordance with United States law.”
President Reagan ratified Executive Order No. 12284 on February 24, 1981 and on February 26, 1981 the Acting Assistant Attorney General of the United States formally advised this court in a statement of interest that a determination had been made by the Reagan Administration that the Agreement would be implemented.
The instant action was commenced by service of the summons and complaint on February 25, 1980. The complaint alleges that defendant, contrary to the law of Iran, held various offices in the government under the Shah, and also served as his personal advisor and confidante; that the Shah and defendant had a fiduciary obligation to refrain from profiting personally at the expense of the government; and that the Shah, with the aid and connivance of defendant, abused his position of trust to enrich himself and defendant by diverting government funds and other government property to their own use. The complaint seeks the following relief: (1) An accounting of all moneys and property unlawfully acquired by defendant from plaintiff and its predecessor government; (2) imposition of a trust on defendant’s assets pending such an accounting; (3) a permanent injunction restraining defendant from alienating any assets owned or controlled by her pending the accounting; and (4) compensatory and punitive damages in the amount of three billion dollars.
As indicated, the first ground alleged as a basis for dismissal of the complaint is that it involves nonjusticiable political questions over which the court lacks subject matter jurisdiction. The “political question” doctrine, stated succinctly, holds that certain issues should not be decided *595 by courts because their resolution is committed to another branch of government and/or because those issues are not capable, for one reason or another, of judicial resolution. (Baker v Carr, 369 US 186, 217). Prominent among issues which fall within the political question doctrine are those involving foreign relations. These would include, as examples, questions which concern the recognition of foreign governments; the recognition of claims of sovereignty over disputed territory; the recognition of states of belligerency; and determinations of a person’s status as a representative of a foreign government. (Id., at pp 212-213.) It has been held that such questions are left to the executive branch of Government for determination, not only because of its primacy in the field of foreign relations, but also because of the need to apply standards that defy judicial application, and the necessity that the Government speak with one voice in such matters. (Id., at p 211.)
Defendant contends that the instant action presents nonjusticiable political questions because it involves the internal affairs of a foreign country. However, not all cases that touch upon matters of foreign relations come within the doctrine. (Id., at pp 211, 217; Anderson v Krupsak, 40 NY2d 397, 403-404.) Each case must be analyzed independently to determine the applicability of the doctrine. (Baker v Carr, supra, at p 217.)
Entertainment of plaintiff’s complaint by the court would require it to determine whether certain actions of defendant and the Shah violated fiduciary obligations placed on them by Iranian law. In general terms, it asks the court to apply foreign law to a dispute arising in a foreign country between litigants who are subject to the jurisdiction of this court. Such a case, without more, does not present a nonjusticiable political question. Clearly, the application of foreign law to a matter before it is not beyond the competence of New York courts. (See, e.g., Anderson v N. V. Transandino Handelmaatschapij, 289 NY 9 [Dutch law during the Nazi occupation]; Holzer v Deutsche Reichsbahn-Gesellschaft, 277 NY 474 [German law during the reign of the Third Reich].) Indeed, the CPLR permits New York courts to take judicial notice of the laws of foreign countries under appropriate circum *596 stances. (CPLR 4511, subd [b].) Nor is the application of foreign law committed exclusively to the executive branch of Government. As the Supreme Court in Zschernig v Miller (389 US 429, 433) stated: “State courts, of course, must frequently read, construe, and apply laws of foreign nations. It has never seriously been suggested that state courts are precluded from performing that function, albeit there is a remote possibility that any holding may disturb a foreign nation — whether the matter involves commercial cases, tort cases, or some other type of controversy.” A State court oversteps its bounds and trespasses upon territory reserved to the Federal executive only when, for example, it takes it upon itself to judge a foreign nation’s law as just or unjust (Zschernig v Miller, supra), or refuses to recognize as valid the laws and decrees of a foreign government which has been recognized by the United States. (United States v Pink, 315 US 203.) In the instant case, the court is asked to construe and apply, without more, the laws and the Constitution of the Empire of Iran. This is within its province and by doing so it is not supplanting the function of the executive branch of Government.
Finally, the court is not being asked to render its opinion in an area in which the Nation must speak with a single voice. It is not even suggested by defendant that in the event the various courts of the United States, considering cases analogous to the instant one, differ in their interpretation of the law of the Empire of Iran, such a danger to the peace of nations will arise that they should refrain from hearing the cases. The Supreme Court in Zschernig v Miller (supra) found no such danger in the continuing application of foreign law by the courts of the various States. (Id., at p 433.)
Any doubt as to whether the present case should be dismissed because it presents a political question is resolved by the Agreement entered into between Iran and the United States, the implementing Executive Order of President Carter, the ratifying Executive Order of President Reagan, and the statement of interest submitted by the Justice Department. The political question doctrine in the area of foreign relations evolves from a recognition by *597 both Federal and State courts that such questions are normally better decided by the executive branch of the Federal Government. (Occidental of Umm al Qaywayn v Certain Cargo of Petroleum, 577 F2d 1196, cert den sub nom. Occidental of Umm al Qaywayn v Cities Serv. Oil Co., 442 US 928; Matter of New York Times Co. v City of New York Comm, on Human Rights, 41 NY2d 345; Russian Socialist Federated Republic v Cibrario, 235 NY 255; Wulfsohn v Russian Socialist Federated Soviet Republic, 234 NY 372, app dsmd 266 US 580; Liang Ren-Guey v Lake Placid 1980 Olympic Games, 72 AD2d 439, affd 49 NY2d 771.) Here, however, the executive branch has implicitly assented to the assumption of jurisdiction by this court over the subject matter of this action. The Agreement, the Executive Orders of Presidents Carter and Reagan, and the statement of interest all contemplate that actions such as the instant one will be resolved by the courts in which they are brought, and the views and desires of the Federal executive branch are entitled to deference in this regard. (See First Nat. City Bank v Banco Nacional de Cuba, 406 US 759, 768 [plurality opn of Rehnquist, J.]; id., at pp 776, 790 [Brennan, J., dissenting]; Banco Nacional de Cuba v Sabbatino, 376 US 398, 436; United States v Pink, 315 US 203, 230-231, supra.)
For all the foregoing reasons, the court concludes that it is not precluded from entertaining this action on the ground that it presents nonjusticiable political questions for resolution.
This brings us to a consideration of defendant’s contention that the complaint should be dismissed because plaintiff comes into court with unclean hands. Defendant notes that the ransom demands made by plaintiff after it had seized the American hostages included a demand for the transfer of the assets of the Shah and his immediate family to the Government of Iran. This, defendant points out, is essentially the relief sought in this action. Defendant argues that such self-help constituted conduct so immoral and unconscionable that plaintiff’s action should be dismissed on the basis of the equitable doctrine that one who has “unclean hands” will be denied relief by a court of equity.
*598 The doctrine of unclean hands is applicable where the plaintiff is guilty of “immoral, unconscionable conduct and * * * ‘when the conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct [omitting citations]’ ” (National Distillers & Chem. Corp. v Seyopp Corp., 17 NY2d 12, 15-16, quoting Weiss v Mayflower Doughnut Corp., 1 NY2d 310, 316). Thus, under Seyopp, to warrant dismissal of a complaint under the doctrine of unclean hands, it must be demonstrated that plaintiff’s conduct is immoral and unconscionable; is directly related to the subject matter of the action; and causes injury to the party asserting the doctrine.
Plaintiff’s reprehensible action in seizing the hostages and holding them for ransom clearly constitutes immoral and unconscionable conduct. Moreover, the freeze imposed on defendant’s transfer of her assets by the Agreement and Executive Order No. 12284 was injurious to defendant and was a direct consequence of the seizure of the hostages. The remaining issue, then, is whether defendant’s conduct is directly related to the subject matter of the litigation. Defendant contends that plaintiff’s conduct meets the “relation test” because it was self-help designed to obtain the very results sought in this action.
In Seagirt Realty Corp. v Chazanof (13 NY2d 282, 285), the New York Court of Appeals strictly defined the relation test: “[T]he unclean hands doctrine bars only causes of action founded in illegality or immorality.” (Emphasis in original.) Burickson v Kleen Laundry Serv. (242 App Div 701) presents a particularly cogent example of a cause of action “founded in illegality or immorality”. Plaintiff was the president of a labor union seeking specific performance of a collective bargaining agreement. He was denied relief because defendant had executed the agreement only after plaintiff had threatened to ruin its business by disclosing its trade secrets to competitors. Another example may be found in American Cyanamid Co. v Power Conversion (71 Misc 2d 213). In that case plaintiff brought an action against a former employee for misappropriation of trade secrets. Defendant asserted that plaintiff was guilty of unclean hands because it had fraudulently concealed the *599 secrets in question when it applied for certain patents to the Patent Office. The court held that the doctrine of unclean hands was applicable because it found that plaintiff would have had no trade secrets which could be misappropriated if it had made the disclosure to the Patent Office required by statute.
From the foregoing, it is apparent that in order to satisfy the relation test, plaintiff’s conduct must directly concern the transaction, event or property which is the subject matter of the lawsuit. (TNT Communications v Management Tel. Systems, 32 AD2d 55, 57, affd without opn 26 NY2d 639.) The test is not met in the instant case by the plaintiff having attempted earlier to obtain in an illegal and immoral manner that which it now seeks to obtain in a court of law. (But see Hall v Wright, 240 F2d 787.) The complaint is founded upon the conduct of defendant and the Shah during the period of the Shah’s rule. The conduct alleged as a basis for the applicability of the unclean hands doctrine was the seizure of the hostages. This is not directly or even indirectly concerned with the transactions which are the subject of this action. Accordingly, the doctrine is not applicable to the instant case.
Even assuming that plaintiff’s conduct did constitute unclean hands, there is nevertheless a compelling reason why the doctrine should not be applied. Implicit in the Agreement is the intent of both signatory parties that plaintiff’s prosecution of actions such as the present one should not be affected by plaintiff’s participation in the holding of the hostages for ransom. Thus, a ruling by this court that plaintiff is barred from obtaining relief because of its role in the hostage crisis would be inconsistent with the Agreement and would therefore contravene clause 2 of article VI of the Constitution which provides that all treaties shall be the supreme law of the land and shall be binding upon the State judiciary. While the Agreement is not a treaty, the rule with respect to it is the same. (United States v Pink, supra; United States v Belmont, 301 US 324.) In United States v Belmont, the court held that State law cannot frustrate the intent of an executive agreement between the United States and a foreign power. The Supreme Court repeated its holding in Belmont in United *600 States v Pink (supra). Pink concerned facts almost identical to Belmont. In Pink, the New York Court of Appeals had sought to distinguish its case from Belmont in order to invoke the State’s policy of barring enforcement of foreign confiscatory decrees. The Supreme Court in rejecting the Court of Appeals reasoning, stated as follows: “No State can rewrite our foreign policy to conform to its own domestic policies. Power over external affairs is not shared by the States; it is vested in the national government exclusively. It need not be so exercised as to conform to state laws or state policies, whether they be expressed in constitutions, statutes, or judicial decrees. And the policies of the States become wholly irrelevant to judicial inquiry when the United States, acting within its constitutional sphere, seeks enforcement of its foreign policy in the courts.” (United States v Pink, 315 US, at pp 233-234.)
It is true that the United States did not directly address the issue of the applicability to this action of the doctrine of unclean hands in the Agreement and Executive Order. It is also true that the Agreement provides for application of United States law to plaintiff’s claim against the late Shah and his family, and that the doctrine of unclean hands is part of that law. However, it would be sheer sophistry to conclude that the doctrine may therefore be applied consistently with the Agreement. President Carter or Reagan arguably could have disavowed the Agreement on the ground that it was procured by the use of force, in violation of international law. (See, generally, Note, The Iranian Agreement under International and United States Law, 81 Col L Rev 822, 826-837.) However, the Agreement was not disavowed. The statement of interest advised the court that the Reagan Administration had reviewed the Agreement and had determined that it should be implemented. Since the Federal executive branch has determined that the best interests of the United States would not be served by disaffirmance of the Agreement because of the events leading up to it, this court is not free to deny the Iranian Government of one of the benefits of the Agreement: litigation on the merits of its claims against defendant. The court may not render judgment against plaintiff by reason of conduct of which the executive branch of the Govern *601 ment was fully aware, and which, in the exercise of its foreign relation powers, it has implicitly determined should not constitute a bar to a consideration of plaintiff’s claims on the merits.
The final ground urged by defendant for dismissal of the complaint is forum non conveniens, that is, in the interest of substantial justice the action should be heard in another forum. (CPLR 327.) This contention may be speedily disposed of. It has been held that the doctrine should be applied, “when it plainly appears that New York is an inconvenient forum and that another is available which will best serve the ends of justice and the convenience of the parties.” (Silver v Great Amer. Ins. Co., 29 NY2d 356, 361.) Thus, the doctrine presupposes the existence of another forum in which the defendant is amenable to process. (Gulf Oil Corp. v Gilbert, 330 US 501.) No such alternative forum exists. Under normal circumstances, the obvious forum for the trial of this action would be Iran. However, for equally obvious and understandable reasons, defendant who is the moving party, is unwilling to submit herself to the jurisdiction of the Iranian courts. On the other hand, she has been served with process in the instant action and is properly before the New York courts. It has not been suggested that, other than Iran, there is another forum available more suitable than New York in which to try this case. Accordingly, the motion to dismiss on the ground of forum non conveniens must be denied. In so ruling, the court is mindful of the scholarly opinion of Mr. Justice Irving Kirschenbaum in Islamic Republic of Iran v Pahlavi (Index No. 22013/79, NYLJ, Sept. 16, 1981, p 6, col 3), a companion case to the one before this court, in which Justice Kirschenbaum concluded that the action before him should be dismissed on the ground of forum non conveniens. This court respectfully disagrees with that conclusion and declines to follow it.
For all the foregoing reasons, the motion to dismiss the complaint is denied.