In the Matter of WILLIAM HARRIS, Appellant, v TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, Respondents.

First Department, December 22, 1983

### APPEARANCES OF COUNSEL

*Harry Kresky* of counsel (*Frank Campana* with him on the brief; *Kresky, Sinawski & Hollenberg,* attorneys), for appellant.

*Robert S. Arbeit* of counsel (*Byron Golden,* attorney), for respondents.

### OPINION OF THE COURT

ASCH, J.

Petitioner has lived in a Columbia University-owned apartment building at 601 West 115th Street since 1971 pursuant to a series of one-year leases, renewed annually, which contained an "affiliation clause" requiring him to maintain an affiliation with the university as a condition

to continuing his tenancy. Petitioner had been chief reference book editor of Columbia University Press from 1969-1975, mainly as editor-in-chief of the Columbia Encyclopedia. Upon the completion of the encyclopedia project he left Columbia's employ. In what was admittedly a tactic to retain his university affiliation and ergo his residence, Harris began working part time and informally in 1975 as a consultant to the Columbia University Library, basically in the School of International Affairs, aiding foreign students in their research and in their difficulties with the English language, for a "modest annual honorarium". Harris allegedly continued in this capacity from 1975 through 1980.

The university sought documentation of petitioner's affiliation status in 1978 and Dr. George Lowy, since retired, sent a statement as to Harris' consultant status. A similar request for proof of affiliation was made on October 1, 1980, and Harris submitted a letter from one "Donald Chang, Chief, Research Facilities-South Asia Division, School of International Affairs", dated October 6, 1980, which stated that Harris was employed as a "consultant to the Center for South Asian Studies". Petitioner was advised that this letter was not sufficient proof of affiliation and a notice to vacate was served on him on November 7, 1980.

In December of 1980, petitioner was admitted as a full-time PhD candidate student in the University's Graduate School of Arts and Sciences. His lease was renewed until December 31, 1982. Thereafter, the university became aware that there was no "Donald Chang" employed by the South Asia Institute. Raymond Anderson, Associate Dean of the Graduate School of Arts and Sciences, wrote petitioner on June 30, 1981, advising him that disciplinary action may be taken because of his submission of this allegedly fraudulent letter. Anderson asked petitioner to make an appointment with him to "discuss the matter" and "make any representations on your own behalf".

A meeting was then held between Anderson and Harris on August 17, 1981. Anderson termed it a "hearing" while Harris characterized it as a "stern headmaster dressing down an adolescent student". It appears that what trans-

pired was, in fact, a face to face meeting between only Anderson and Harris in Anderson's office, at which Anderson informed Harris that he believed the "Chang" letter to be a forgery prepared by Harris and Harris replied by denying that it was a forgery and stating that he obtained the letter by means of a telephone conversation with an unknown person in the School of International Affairs.

Anderson wrote Harris a letter on August 17, 1981, memorializing the meeting, and stated in it that he considered the explanation "implausible" but would give Harris the "benefit of the doubt" and consider his action "gross negligence". As a consequence, Anderson stated that Harris would have two weeks to "submit persuasive evidence" that the letter "represented a bona fide affiliation with the University acceptable to the Office of the General Counsel". If Harris could not make such a showing, Anderson would then "request that your lease not be renewed upon its termination".

Harris replied by a letter dated August 28, 1981, explaining his long-term affiliation with the university, including his current status as student, and reiterating his story concerning the letter and his innocence in obtaining it. He also claimed that his lease was renewed in December based upon his new status as student, and not upon any effect of this letter.

Anderson immediately replied by rejecting this letter as "[r]eminding me of what I already know" and not as "persuasive evidence". Anderson stated that "I consider the issue closed".

Columbia instituted a holdover proceeding in Civil Court on April 7, 1982, to recover possession of the apartment. On May 6, 1982, this proceeding was discontinued due to the existing extension of Harris' lease until December, 1982 (claimed to be a clerical error).

On July 7, 1982, in another attempt to get Harris out of the apartment, Anderson wrote Harris, claiming that he took "advantage" of this clerical error "to evade my directive" in "a flagrant breach of discipline". Anderson informed him that unless Harris *vacated the apartment* by September 1, 1982, he would "not be permitted, for discipli-

nary reasons, to enroll in the University in the future, and that fact will be noted on your permanent academic record".

On August 2, 1982, Harris' attorney, Harry Kresky, responded to the July 7 letter, stating that Harris had a valid lease until December 31, 1982 on the basis of being a bona fide student and not because of the allegedly fraudulent letter of October, 1980.

By letter dated September 17, 1982, Anderson dismissed Harris from the university for disciplinary reasons for failure to comply with the prior directive to vacate the apartment.

Harris then instituted this instant CPLR article 78 proceeding challenging this determination.

The application was denied and the petition dismissed by Special Term on the grounds that petitioner did not show that the university abused its discretion, violated due process or acted contrary to law. It found that petitioner had notice and an opportunity to be heard and that also he did not exhaust his administrative appeals. Finally, Special Term found that because of the allegedly underlying fraud of the Chang letter, petitioner was barred from relief under the clean hands doctrine.

The majority of this court disagrees with Special Term and would reverse.

It is undisputed that the actions of a private university against a student are subject to article 78 review and that the courts will intervene if the disciplinary dismissal of a student is arbitrary (e.g., *Matter of Sofair v State Univ.*, 54 AD2d 287, revd on other grounds 44 NY2d 475). However, it is equally well settled that "[w]hen a university, in expelling a student, acts within its jurisdiction, not arbitrarily but in the exercise of an honest discretion based on facts within its knowledge that justify the exercise of discretion, a court may not review the exercise of its discretion" (*Matter of Carr v St. John's Univ.*, 17 AD2d 632, 634, affd without opn 12 NY2d 802; see, also, e.g., *Tedeschi v Wagner Coll.*, 49 NY2d 652; *Matter of Olsson v Board of Higher Educ.*, 49 NY2d 408; *Matter of Sofair v State Univ.*, supra).

In matters concerning a student's academic qualifications, the determination of the school is granted great weight and courts are reluctant to intervene, as such determinations are within the expertise of the university and rest upon the subjective professional judgment of trained educators (see *Matter of Olsson v Board of Higher Educ., supra*). But in cases involving expulsion for causes unrelated to academic achievement, courts must look more closely at the matter (see *Tedeschi v Wagner Coll., supra,* at p 658).

In the case at bar, the factual background, given at some length *supra,* shows that Columbia University was acting throughout not as an academic aerie of higher education. Dean Anderson appeared primarily concerned with getting petitioner out of a rent-stabilized apartment on behalf of the landlord, Columbia. To that end, he held the threat of Harris' status as a Columbia student as a sword of Damocles over petitioner's head. The issue presented is simply put — was Anderson, acting on behalf of the University, arbitrary when he dismissed Harris for failure to comply with a directive to vacate an apartment to which Harris had a legal right? I note that although the university speaks of Harris' fraud vis-à-vis the letter he submitted, the express reason he was dismissed was his failure to leave his apartment despite his lease and despite the fact Columbia had discontinued the holdover proceeding in Civil Court. When the university acts as a university, this court should be mindful of the restrictions placed upon judicial scrutiny of its actions in expelling or disciplining students. When, however, the university acts as a landlord, then this court must be more mindful of the rights of the student qua tenant. It offends the basic sense of fairness for the college to use its disciplinary power to strengthen its bargaining position as a landlord.

In the instant case it is true that the submission of the "Chang letter" was probably a fraudulent act, even though Columbia did not conclusively prove so. Harris' explanation was implausible, but Columbia did not rebut it or investigate the matter further. However, we will assume that the letter *was* fraudulently submitted by Harris.

The incident occurred *before* Harris was admitted as a student. It also did not affect his tenant status, as the university rejected the letter as a basis for a lease renewal and only later renewed Harris' lease based on his affiliation as a student (although it claims such renewal was a "clerical error").

It was almost a year later before the matter was brought to the attention of Dean Anderson. Petitioner complains that the action that Dean Anderson took deprived him of due process. However, Anderson did afford him a meeting in his office and offered him a chance to give his side of the story. In private university procedures, due process does not envision a full hearing but rather only an informal opportunity to be heard by students, i.e., "to present their version of the case and to make such showing as they desire to the person or group of persons who have the authorized responsibility of determining the facts of the case and the nature of the action, if any, to be taken" (*Spatol v Barton,* 69 Misc 2d 35, 39; see, also, *Matter of Sofair v State Univ., supra,* at p 295).

After this meeting, Anderson meted out the penalty: that Harris vacate his apartment. It is unclear whether an associate dean of a division of the university has the authority to make such a landlord decision, in the course of fulfilling his "academic duties".

Columbia backed up this determination by bringing an action in Civil Court to evict Harris. Harris won this action, as, upon a showing of his valid lease, Columbia was forced to discontinue the action.

It was only thereafter, now two years after Harris was a student, that Anderson made a determination to expel him and forbid him to register as a student. Anderson claimed that Harris "took advantage" of the alleged "clerical error" of the renewed lease to "evade his directive". The expulsion of petitioner for this avowed reason was arbitrary and capricious.

Harris merely properly defended in court the eviction proceeding against him, presenting his valid lease, obtained on the basis of his affiliated status as a student. The decision to expel him as a student was a punitive measure aimed to strip him of his affiliated status and thus his

apartment, where he resided for 11 years. No disciplinary action against him qua student was taken in 1981 when the allegedly forged letter was considered and then the matter closed. If the university had taken its action then, upon that basis, the result might well be different.

There are very few reported cases dealing with judicial review of university expulsion of a student for nonacademic discipline, but most of them have upheld the university action.

In *Goldstein v New York Univ.* (76 App Div 80) plaintiff was expelled from New York University Law School for the indiscretion of passing a letter to a woman classmate "express[ing] a desire to make her acquaintance" and "thinking it uncourteous to present myself without your assent, I ask if I may do so in the class room" (p 83). The woman reported the letter to the dean, and the plaintiff lied and denied writing it when he was confronted. Plaintiff had a full hearing on the matter, and this court found (p 85) "such a person would be unfit to remain a member of the law school" and upheld the expulsion.

In the case of *Samson v Trustees of Columbia Univ.* (101 Misc 146, affd without opn 181 App Div 936) plaintiff, a Columbia undergraduate, attended a demonstration against General Leonard Wood in 1916 and made an antidraft speech at an Emma Goldman rally in 1917. Columbia refused to allow him to register for the upcoming term on the grounds of moral unfitness, and the court upheld the action. After moralizing about the necessity of the draft and the evils of socialism, the court stated that " '[m]isconduct' perhaps refers more particularly to demeanor within the walls of the institution or in connection with the ordinary activities of student life, and of improper practices by the plaintiff in that regard there is no claim made here. But the implied stipulation of good conduct * * * is not * * * to receive the restricted construction that the student's conduct may be the subject of control only in so far as it relates to his actions in his capacity and status as student * * * [A]ny conduct that may interfere with or injure the university, or lessen its proper control over its student body, or impair its influence for good upon its

students and the community [may be disciplined]." (*Samson v Trustees of Columbia Univ., supra,* at p 150.)

In *Anthony v Syracuse Univ.* (224 App Div 487, 489) the court upheld the expulsion of a student because of rumors about her life-style that did not make her a "typical Syracuse girl".

While these cases may appear archaic, they are cited with approval in *Matter of Carr v St. John's Univ. (supra)* and many other cases to the present day, as leading authorities for the proposition that a university may expel a student for nonacademic reasons.

In *Carr (supra)* four students participated in a civil marriage (two were the married couple, the other two witnesses) in violation of Roman Catholic law. St. John's University expelled them for violating a school rule prohibiting "un-Christian conduct", and the students brought a CPLR article 78 proceeding challenging their dismissal. The Supreme Court granted their petition, but the Appellate Division reversed, 3 to 2, upholding the school's action as a legitimate exercise of its discretion. The Court of Appeals affirmed, 5 to 2, on the decision below.

The more modern trend has been to extend the court's discretionary power to overrule the arbitrary exercise of university discipline.

In *Tedeschi v Wagner Coll. (supra)* the Court of Appeals sent the matter back to the university for a hearing when a student was dismissed for emotional problems. In *Matter of Ryan v Hofstra Univ.* (67 Misc 2d 651) a student was dismissed for an alleged act of vandalism, throwing a rock through the bookstore window. The court held that he could not be disciplined without full due process and that expulsion as a student was too severe a penalty for this nonacademic misconduct. In *Morales v New York Univ.* (83 AD2d 811, affd on memorandum below 55 NY2d 822) this court held that where the institution exercises its discretion arbitrarily, judicial intervention is warranted even in controversies involving academic standards.

In the matter currently before this court, the allegedly fraudulent letter was sent before petitioner became a student. The only misconduct alleged against him during the

time he was a student was his alleged failure to comply with the directive of Anderson and vacate his housing. No misconduct was alleged against him as a student. The Graduate School of Arts and Sciences bulletin, i.e., the student handbook which is the basis of Columbia's action against him under a contract basis, or as a member of an association (see *Tedeschi v Wagner Coll., supra*), merely contains a rule that a student's continuation in the university is "strictly subject to the disciplinary powers of the university". There is no specific rule that he was alleged to have violated. Under the general disciplinary powers of the university, this extreme and capricious punishment for conduct totally unrelated to his continuation as a student can be deemed "arbitrary".

Special Term held that relief should also be barred for petitioner's failure to exhaust his administrative appeals. However, Dean Anderson in his expulsion letter did not advise petitioner of any avenues of appeal (although admittedly petitioner was told on the eve of bringing this action that he could appeal to the Dean of the Graduate School of Arts and Sciences). In *Matter of Ryan v Hofstra Univ.* (*supra*) the expulsion letter was termed "permanent and complete". The court there held that "[t]he law does not require exercises in futility. The authorities in New York are plain that where the end result is apparent, and administrative proceedings are moot, they need not be carried to their technical end." (*Matter of Ryan v Hofstra Univ., supra,* at p 657.)

Special Term was also in error in applying the "clean hands" doctrine as an alternative ground for denying relief. This doctrine is applicable when the immoral or unconscionable conduct complained of is directly related to the subject matter in litigation and the party invoking the doctrine was injured by such conduct (see *Islamic Republic of Iran v Pahlavi,* 116 Misc 2d 590, 598-599). As noted above, the submission of an allegedly fraudulent letter concerning his apartment was not "immoral or unconscionable" conduct related to his status as a student.

Accordingly, the order and judgment (one paper) of Supreme Court, New York County (M. EVANS, J.), entered January 13, 1983, denying petitioner's application and

dismissing the petition, should be reversed, on the law and facts, without costs, the petition reinstated and the application granted.

SILVERMAN, J. (concurring). I agree with Justice ASCH's opinion. The university clearly had a right to exclude from its graduate program, for reason of character, a student who had sent to it a fraudulent letter in order to keep his apartment. But it could not exclude him as a *student* for failure to give up the apartment leased from the university. If the university was willing to keep petitioner as a student notwithstanding his fraudulent letter if he gave up the apartment (to his possession of which the fraudulent letter had not contributed), then excluding him as a student for failure to give up the apartment was not the legitimate exercise of the university's power to exclude a student for bad character but a misuse of that power to give the university rights as a landlord which it would not otherwise have and a recognition of the fact that the letter and his character were not the reasons for excluding him as a student.

KASSAL, J. (dissenting). The issue before us on this appeal is whether a private university may deny enroll-ment to one who has demonstrated by fraudulent and deceitful conduct that he lacks the character, the honesty and the integrity expected of a student at an institution of higher learning. On this record, we do not perceive any basis to interfere with the reasoned judgment of respondents, taking into account that petitioner has, for an extended period of time, used every conceivable device to retain his university housing. Respondents' determination, that his fraudulent submission of a letter falsifying his affiliation with Columbia was sufficient ground for expulsion, should not be disturbed. Inasmuch as there has been no showing that the disciplinary action did not comply with the rules and regulations of the university, there is no basis for judicial intervention.

Petitioner, 55 years of age, has been living in Columbia University housing at 601 West 115th Street since December, 1971. For more than a decade, he has resided there pursuant to leases, renewed annually, in accordance with university rules which require, as a condition to continued

occupancy, that the tenant be a member of the staff or a student at the university. From 1968 to 1975, Harris served as a staff member of Columbia University Press in connection with the publication of the New Columbia Encyclopedia, completed in June, 1975. As a result of the affiliation clause contained in the lease, he continued his occupancy thereafter, since he served as consultant to Dr.. Lowy, Chief, Social Science Division, Columbia University Libraries, receiving "a modest annual honorarium" in return. His lease was renewed on December 4, 1978, when Dr. Lowy submitted a statement as to his status as a consultant to the School of International Affairs (SIA). According to petitioner, after Dr. Lowy left Columbia in 1979, Harris continued as a consultant to SIA students.

In September, 1980, in accordance with standard procedure, petitioner was requested to once again submit evidence of his then affiliation. Accordingly, on October 8, 1980, Harris presented a letter from one "Donald Chang, Chief, Research Facilities — South Asia Division, School of International Affairs", attesting to petitioner's status as "a consultant to the Center for South Asian Studies". Subsequently, Columbia's Office of Investments ascertained that there was no Donald Chang employed by the school, that Harris was not a consultant to SIA, that there was no "South Asia Division" of SIA nor was there anyone with the title "Chief, Research Facilities — South Asia Division". As a result, on November 7, 1980, petitioner was served with a notice to vacate, respondents having determined that petitioner had fraudulently submitted the Chang letter in an effort to keep his apartment in violation of university rules. One month later, in December, 1980, petitioner enrolled in the Graduate School of Arts and Sciences. Taking into account the time sequence and that petitioner had previously received a Masters degree in Columbia but had not attended school for many years, it is clear that this enrollment was another final effort to avoid expulsion as a tenant.

The circumstances respecting the Chang letter did not come to the attention of Raymond Anderson, Associate Dean of the Graduate School, until the winter of 1981. On June 30, 1981, Anderson wrote to Harris to advise him that

the submission of the fraudulent letter would require necessary disciplinary action for the "breach of conduct affecting your status as a student". On August 17, 1981, a hearing was held in Anderson's office, the substance of which was set forth in a letter to Harris. Harris' explanation, offered as to the misrepresentation contained in the Chang letter, was rejected by Anderson as "implausible", Harris having claimed he had received the letter following a telephone call with an unknown person at SIA and that he had submitted the letter without reading it. Anderson advised petitioner that the school was not prepared to ignore the consequences of his action and demanded that Harris submit evidence that the Chang letter reported a bona fide affiliation with the university and that, if such proof was not forthcoming, he would request that petitioner's lease not be renewed and that the space be reassigned "in accordance with the policy and priorities established by the University".

In response, Harris claimed to be "the unwilling victim of a sympathetic, if misguided, staff member of the School of International Affairs". He set forth his long affiliation with the university, advising that he had been readmitted to the graduate school and that the only stipulation was that he complete his degree by 1984. He stated his view that he had "acted honorably" and further expressed the "hope that we can reach an equitable agreement". Petitioner made no attempt to substantively authenticate the misrepresentation as to his affiliation despite his association with SIA for some period.

Although Anderson expected that petitioner's lease would not be renewed as a result of his devious conduct, nevertheless, through a clerical error in the housing office, the term was renewed for an additional year, until December, 1982. As a result, the holdover proceeding, which had been brought to recover possession of the apartment, was discontinued. On July 7, 1982, Anderson reminded Harris of the direction that he vacate the apartment which he had obtained by fabrication, advising that unless Harris vacated by September 1, 1982, he would not be permitted to enroll in the university in the future and that the disciplinary action would be noted on his permanent academic

record. On August 2, 1982, petitioner's attorney requested the intervention of the office of the general counsel, pointing to the fact that Harris had a valid lease until December 31, 1982 and that the lease was obtained as a result of his status as a student and not due to any fraudulent submission.

This article 78 proceeding was commenced October 5, 1982, to annul respondents' determination not to permit Harris to register for the fall 1982 term. Special Term, finding that petitioner had not sustained his burden in establishing either an abuse of discretion or a violation of due process rights, dismissed the petition. Concluding that petitioner had been accorded notice and an opportunity to be heard, as well as an administrative appeal, which he chose not to pursue, the court found persuasive evidence that petitioner had perpetrated a gross fraud upon the respondents to avoid eviction from his university housing.

We fully agree with Special Term's assessment of the case and perceive no reason on this record for judicial intervention with the proper exercise of administrative discretion by the university in light of what clearly appears to be outright trickery by petitioner. In cases involving controversies with respect to academic standards, our courts have been reluctant to intervene where the institution acted in good faith, a policy which the Court of Appeals has indicated is "founded upon sound considerations of public policy" (*Matter of Olsson v Board of Higher Educ.*, 49 NY2d 408, 413). However, where suspension or expulsion is predicated upon grounds unrelated to academic achievement, the operative standard requires that the educational institution proceed in accordance with its own rules and guidelines (see *Tedeschi v Wagner Coll.*, 49 NY2d 652, 659-660; *Sabin v State Univ.*, 92 AD2d 831). Thus, while such situations involving nonacademic discipline are susceptible to judicial scrutiny, the guiding principle remains that "[w]hen a university, in expelling a student, acts within its jurisdiction, not arbitrarily but in the exercise of an honest discretion based on facts within its knowledge that justify the exercise of discretion, a court may not review the exercise of its discretion" (*Matter of Carr v St. John's Univ.*, 17 AD2d 632, 634, affd 12 NY2d 802).

As applied here, petitioner's character is a key element in this graduate program and there has been no showing that the university failed to abide by its own rules and regulations in directing petitioner's expulsion. Petitioner received fair treatment and due process in that he was fully apprised of the charge, accorded a hearing, albeit informal, before the associate dean of the graduate school and was apprised of his right to appeal. Contrary to the position assumed by the majority, the fraudulent submission, clearly designed to enable petitioner to retain his housing accommodation, was a matter of legitimate concern to the university. It evinced a degree of dishonesty and lack of character, a matter of vital interest to an academic institution, which may reasonably expect honesty and fairness by its students in dealings with the university. In the absence of some affirmative showing of unfairness or that respondent did not act in accordance with published rules or guidelines, the disciplinary action taken was not unreasonable, arbitrary or capricious. To rule otherwise would, indeed, honor form over substance and would amount to unjustifiable interference in academic affairs.

*Tedeschi v Wagner Coll.* (*supra*) relied upon by the majority, does not require a different result here. In that case, the student had been suspended for conduct which posed both academic and social difficulties. She had incomplete grades in two courses and had displayed irrational and disruptive conduct, both in class and outside of school, by placing harassing telephone calls to an instructor. The Court of Appeals reversed and remanded the matter, however, since the student had not been accorded a review of the suspension by the hearing board and the president, and, thus, the college did not act in accordance with its own rules before imposing disciplinary action.

We also find the petition palpably insufficient in that it fails to set forth a cognizable claim for relief in terms required by CPLR 7803. Noticeably absent is any allegation that the determination was made "in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion" (CPLR 7803, subd 3). The petition only denies that petitioner

committed "any fabrication or fraud in causing the letter from Mr. Chang to be written" and alleges that respondents "have no written rules or regulations" to govern the situation. To the contrary, while the record does not reflect the full extent of existing university rules, it appears that a bulletin of the graduate school advises that continuation in the university was "strictly subject to the disciplinary powers of the University." To the extent that no specific rules or guidelines existed as to this precise fact pattern, the institution was obligated to act fairly in connection with any disciplinary action to be taken. Inasmuch as petitioner was accorded a hearing and opportunity to refute the charge and was further apprised of his right to appeal, which he chose not to exercise, there was no violation of due process standards.

The record supports the action taken by respondents in the face of what appears to be a blatant, fraudulent misrepresentation, obviously made to enable petitioner to remain in housing accommodations to which he was not entitled. The purpose of university housing, with its limited facilities and low rental, is to accommodate students and staff members affiliated with the institution. It is not designed to afford low-cost housing to those who seek to become "professional students". Where, as here, the right to such housing has been abused, the institution does have an appropriate remedy. Thus, in *Matter of Goldman (Trustees of Columbia Univ.)* (NYLJ, Nov. 16, 1977, p 10, col 1) Justice FEIN, then sitting at Special Term, dismissed a petition which sought to direct respondents to consider an application for readmission to the Graduate School of Arts and Sciences. In *Goldman,* petitioner had enrolled in the graduate school in 1958 in search of a PhD degree and had leased a residential apartment at $75 per month. During the following 17 years, however, he had still not earned either his Masters or PhD degree and, accordingly, a summary dispossess proceeding was brought. Thereafter, petitioner reapplied for admission, the denial of which led to an article 78 proceeding. The court denied the application, citing Goldman's failure to make any real progress towards completing his thesis during the 17 years since he had completed required courses for his Masters degree.

While the factual situation is not identical to that here, the disposition does reflect that there is an available remedy to prevent the perpetration of a fraud. Under the circumstances, the refusal of respondents to readmit petitioner as a graduate student, as a result of the fraudulent submission of the letter misrepresenting his affiliation with the university, was neither unreasonable nor arbitrary. We see no reason, legally or morally, to reward petitioner for his successful deceit.

Accordingly, the order and judgment (one paper), Supreme Court, New York County (MARTIN EVANS, J.), entered January 13, 1983, denying petitioner's application and dismissing the petition, should be affirmed.

CARRO, J. P., concurs with ASCH, J.; SILVERMAN, J., concurs in an opinion; BLOOM and KASSAL, JJ., dissent in an opinion by KASSAL, J.

Order and judgment (one paper), Supreme Court, New York County, entered on January 13, 1983, reversed, on the law and the facts, without costs and without disbursements, the judgment vacated, the petition reinstated and the application granted.