Levine, J.
(dissenting). I agree with the majority that the Educational Testing Service (ETS) had no duty, express or implied, to investigate the information submitted by Brian *395 Dalton. However, I do not agree that we are bound by the factual determinations of the lower courts, which are based on an erroneous legal standard, or that the record contains any evidence that ETS arbitrarily failed to consider the materials submitted by Dalton. I, therefore, respectfully dissent.
A primary obligation of ETS as administrator of the SAT and other scholastic aptitude tests heavily relied upon by institutions of higher education is to certify that released scores accurately reflect the performance on the test of the identified test taker. The college admission process is highly dependent on the authenticity of the SAT scores released by ETS, as are other test takers whose scores are valued in relation to those of all others who take the exam and are competing for admission. In order to ensure the reliability of its certification process, ETS has established elaborate procedures that balance the harms to institutions and other candidates of the release of possibly invalid scores against the detriment to students whose scores are challenged as potentially invalid. The procedures established by ETS are unquestionably fair; they give test takers whose scores are questioned opportunity after opportunity to validate their scores. In the end, however, ETS as a practical necessity must be the final arbiter of whether it can honestly certify the validity of a student’s score. Thus, the standard contract between ETS and test takers reserves to ETS the right "to cancel any test score * * * if ETS believes that there is reason to question the score’s validity [emphasis supplied].”
Peter Dalton, Brian Dalton’s father, brought this suit based on the claim that ETS treated Brian Dalton unfairly because it did not conduct a thorough investigation of the material Brian submitted to ETS when his scores were questioned. The trial court accepted Dalton’s argument.* Thus, to support its conclusion that ETS failed "to make even rudimentary efforts to evaluate or investigate the information furnished by” Dalton and thus failed to act in good faith in carrying out its obligations to Dalton, the court pointed to ETS’s failure to make contact with or question the proctor, the test administrator, or other students who gave evidence that tended to show that Dalton was present, and to ETS’s refusal to conduct fingerprint *396 or lie detector tests on Dalton (155 Misc 2d 214, 225). Likewise, the Appellate Division clearly considered ETS’s failure to investigate as a factor in its ultimate conclusion that ETS acted without good faith: "The practice of ignoring Dalton’s evidence without even initiating a preliminary investigation clearly demonstrate a lack of good faith by ETS” (206 AD2d 402, 403 [emphasis supplied]).
My colleagues in the majority here, however, correctly conclude that ETS had no express or implied duty to investigate. Thus, it seems indisputable that the ultimate determinations of the courts below — that ETS breached its implied covenant of good faith and fair dealing — were reached at least in significant part by reliance on an erroneous legal standard, that ETS had a duty to investigate. Thus, at a minimum, reversal and remittal for new findings based on the proper legal standard is required here.
However, applying the correct legal standard to the record evidence, it is my conclusion that ETS fulfilled its contractual obligations as a matter of law and, therefore, we should reverse and dismiss the Daltons’ complaint.
As the Chief Judge concludes, ETS was contractually obligated to consider any relevant material that Dalton supplied the Board of Review (majority opn, at 390). After considering that evidence, ETS had the stated right to cancel Dalton’s test score if it possessed "a reason to question” the score’s validity. Thus, it seems self-evident that ETS expressly reserved to itself substantial discretion on whether to refuse to certify a test score.
To be sure, there is a covenant of good faith and fair dealing implicit in the contract between Dalton and ETS (see, Rowe v Great Atl. & Pac. Tea Co., 46 NY2d 62, 68; Van Valkenburgh, Nooger & Neville v Hayden Publ. Co., 30 NY2d 34, 45, cert denied 409 US 875). It requires that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract” (Kirke La Shelle Co. v Armstrong Co., 263 NY 79, 87). In this way, the implied covenant "is in aid and furtherance of other terms of the agreement of the parties. No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship” (Murphy v American Home Prods. Corp., 58 NY2d 293, 304 [rejecting application of implied covenant to at-will employment contracts]). Where good faith is an express condition of a contract that contemplates a wide scope of discretion on the part of one party, there *397 is no breach if the discretionary act performed is "not arbitrary and capricious” (Smith v Robson, 148 NY 252, 255; see also, 3A Corbin, Contracts § 647, at 104-106). The implied covenant does no more; it works only to ensure that a party with whom discretion is vested does not act arbitrarily or irrationally (see, e.g., Tedeschi v Wagner Coll., 49 NY2d 652, 659).
Thus, the issue here is whether there is evidence that ETS performed its discretionary functions arbitrarily or irrationally, or with bad faith in fact (cf., Langston v ACT, 890 F2d 380, 386; Johnson v Educational Testing Serv., 754 F2d 20, cert denied 472 US 1029 [American College Testing Program only contractually required to act in good faith]).
Here, there was no evidence of bad faith in fact. Moreover, ETS had two definitive reports of highly qualified handwriting experts, of proven reliability, that the November 1991 answer sheet was filled out by someone other than the person who filled out the May 1991 exam answer sheet and the documents known to have been signed or produced by Brian Dalton. Surely it was not irrational or arbitrary for ETS to find that the unexplained disparate handwriting on the November 1991 answer sheet gave it reason to question the validity of the second test score. The courts below did not find otherwise. Nor can it be said that, as a matter of law, the evidence submitted by Dalton totally obviated the reasons ETS had to question the test score. It was, therefore, not a breach of the implied covenant of good faith to refuse to certify Dalton’s scores after consideration of the evidence submitted, and the majority does not so hold.
Rather the majority holds that there is evidence that ETS breached its implied covenant of good faith in its deliberative process in failing "to consider” Dalton’s submissions (majority opn, at 391). However, the uncontroverted evidence accepted by the courts below and the majority here is that when ETS received the information submitted by Dalton it did not totally disregard it. Rather, it considered it and judged it weighty enough to merit further evaluation. Thus, it is undeniable that ETS responded to the submissions by retaining another handwriting expert to get a third evaluation of the documents. In addition, ETS submitted Dalton’s additional handwriting samples to its first handwriting expert for a second evaluation.
To overcome this concrete evidence of consideration, the majority points to selectively, narrow portions of the record in which ETS Board of Review members testified that they deemed irrelevant Dalton’s evidence that tended to show he *398 was in the room on the day the test was given as evidence that ETS "failed to consider” Dalton’s submissions, which in turn supported the determination of its breach of the implied covenant of good faith and fair dealing. I disagree.
Again, it is uncontroverted that each member of the ETS Board of Review gave a reason why he or she found Dalton’s submissions irrelevant. Therefore, a breach of the implied covenant of good faith and fair dealing could only be established if the reason the Board members gave to deem irrelevant Dalton’s submissions was arbitrary, capricious or irrational. Each Board member testified that the evidence did not explain their one lingering crucial doubt, the disparate handwriting, which was the exact doubt communicated to Dalton by ETS — "someone else may have completed [the] answer sheet” (Dec. 11, 1991 letter to Brian Dalton). Because the reason to deem irrelevant Dalton’s evidence of presence was not irrational, arbitrary or capricious it cannot, as a matter of law, form the basis of a breach of the implied covenant of good faith. It is only by substituting its judgment for that of ETS as to what should have been deemed relevant evidence that the majority finds evidence of bad faith. However, "[w]hen an [institutional decision maker] * * * acts within its jurisdiction, not arbitrarily but in the exercise of an honest discretion based on facts within its knowledge that justify the exercise of discretion, a court may not review the exercise of its discretion” (Matter of Carr v St. John’s Univ., 17 AD2d 632, 634, affd 12 NY2d 802; see also, Matter of Harris v Trustees of Columbia Univ., 98 AD2d 58, 70 [Kassal, J., dissenting], revd on dissenting opn below 62 NY2d 956).
In sum, ETS acted within its discretion in continuing the security process rather than releasing the score after considering and rejecting Dalton’s evidence. There is no evidence that ETS acted arbitrarily in its discretionary decision-making process. Hence there is no evidence that ETS breached any express or implied covenant in its contract with Dalton. Accordingly, I would reverse the order of the Appellate Division and dismiss the complaint.
Judges Titone, Bellacosa, Smith and Ciparick concur with Chief Judge Kaye; Judge Levine dissents and votes to reverse in a separate opinion in which Judge Simons concurs.
Order modified in accordance with the opinion herein and, as so modified, affirmed, without costs.

 Notably, Dalton’s scores had not been finally cancelled at the inception of this suit. Dalton had been offered, but refused, the opportunity to validate his scores by taking another test at the expense of ETS and scoring within a specified range of his November score, or to submit the matter to arbitration.