OPINION OF THE COURT
John A.K. Bradley, J.
The defendants have been indicted for the crimes of scheme to defraud in the first degree and conspiracy in the fifth degree. Clifford and Altman are also charged with commercial bribe receiving in the first degree. Altman has also been charged with the crimes of falsifying business records in the first degree and offering a false instrument for filing in the first degree. Altman has brought an omnibus motion seeking many forms of relief. Clifford has joined in this motion insofar as it is applicable to him. The other defendants, residents of other countries, have not yet been arrested in connection with this indictment.
This indictment arises out of a lengthy investigation conducted by the Office of the District Attorney of New York County into the affairs of the Bank of Credit and Commerce International (BCCI). The investigation delved into the relationship between BCCI and Credit and Commerce American Holdings (CCAH), a bank holding company that held a New York bank, First American Bank of New York (FABNY), through a chain of holding companies. The investigation examined the manner in which First American Bankshares (one of the chain of holding companies) and FABNY were acquired from their previous owners, how they were managed, the representations made to bank regulators and reports filed with those regulators. Defendant Abedi was the founder and first chairman of BCCI. Defendant Naqvi was president, then chairman of BCCI. Defendants Clifford and Altman were officers and directors of CCAH and its various subsidiaries.
FEDERAL PREEMPTION
Defendant Altman is first claiming that seven of the counts against him are based on false statements or omissions in Federal Reserve forms Y-6 submitted on behalf of CCAH. Altman contends that the District Attorney is predicating this prosecution upon a failure to comply fully and honestly with Federal regulations and that he may not do so.
Altman asserts that the Federal Reserve Board has exclu *908 sive jurisdiction over its own regulations. He points out that the forms Y-6 are required by the Federal Reserve Board pursuant to the Bank Holding Company Act of 1956. (12 USC § 1841 et seq.) That act vests broad regulatory authority in the Board over bank holding companies. Citing Easton v Iowa (188 US 220 [1903]), a case said by the Appellate Division, First Department, to be the "seminal case on Federal preemption of the regulation of national banks” (People v Calandra, 164 AD2d 638, lv denied 77 NY2d 992), Altman asserts that New York may not predicate any criminal charge on what the District Attorney considers to be false answers to questions contained in a Federal form.
Defendant’s arguments have two flaws. The first is that the cases he relies on deal with national banks. Obviously, the Federal laws relating to national banks are more comprehensive than those relating to State banks. However, as the People point out CCAH is not a national bank, nor is First American Bank of New York, the bank CCAH controls in New York State.
The second flaw in Altman’s argument that this prosecution undermines the Federal regulatory scheme is that the Federal Reserve Board has actually taken a position in this case. Acting through the United States Attorney, the Board of Governors of the Federal Reserve System has requested leave to submit (and has actually submitted) a statement of interest in opposition to Altman’s omnibus motion. Altman has moved this court to strike the statement of interest. The court will allow the statement of interest to be considered. This statement not only refutes Altman’s claim that the District Attorney is usurping the jurisdiction of the United States but also "welcomes the vigorous prosecution by the District Attorney of Altman and Clifford for the submission to State regulators of false and misleading information.”
Altman cites Gade v National Solid Wastes Mgt. Assn. (505 US —, 112 S Ct 2374) in support of his claim that Federal law has preempted the field. Gade held that the Federal Occupational Safety and Health Act of 1970 (29 USC § 651 et seq., 84 US Stat 1590) (OSHA) preempted State licensing acts to the extent they established occupational safety and health standards for training hazardous waste workers. Although Gade discusses preemption and finally holds a State statute to be preempted, it does not help the defendants in the instant case because of a significant difference in the preemption language *909 of OSHA and the language of the Bank Holding Company Act of 1956.
OSHA provides that a State " 'shall’ ” submit a plan if it wishes to " 'assume responsibility’ ” for " 'development and enforcement * * * of occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated’ ” (Gade v National Solid Wastes Mgt. Assn., 505 US, at —, 112 S Ct, at 2383, supra). Gade held that: "[t]he unavoidable implication of this provision is that a State may not enforce its own occupational safety and health standards without obtaining the Secretary’s approval” (supra, 505 US, at —, 112 S Ct, at 2383).
The Bank Holding Company Act of 1956 (12 USC § 1846) on the other hand states: "No provision of this [chapter] shall be construed as preventing any State from exercising such powers and jurisdiction which it now has or may hereafter have with respect to companies, banks, bank holding companies, and subsidiaries thereof.”
This different language calls for a different result. The Bank Holding Company Act does not preempt the provisions of the New York Penal Law involved here. (It may also be that a State criminal prosecution would survive a claim of preemption by OSHA; see, People v Pymm, 76 NY2d 511, cert denied 498 US 1085 [decided nearly two years before Gade v National Solid Wastes Mgt. Assn., supra].)
The statement of interest of the United States is entitled to great weight in determining whether a Federal statute has preempted the field. (Liang Ren-Guey v Lake Placid 1980 Olympic Games, 49 NY2d 771; Islamic Republic of Iran v Pahlavi, 116 Misc 2d 590, revd on other grounds 99 AD2d 1009, affd 64 NY2d 831.)
From the foregoing, it appears that the Federal Government has not preempted the field and that New York has jurisdiction to proceed in this matter.
SCHEME TO DEFRAUD
In the first count of the indictment, the defendants are charged with the crime of scheme to defraud in the first degree. The count reads, in part, as follows: "Defendants * * * in the County of New York and elsewhere, acting with others known and unknown to the Grand Jury, during the period from on or about September 1, 1977, through on or about *910 August 18, 1991, with intent to defraud more than one person and to obtain property from more than one person, to wit, state and federal bank regulators and persons doing business with banks, by false and fraudulent pretenses, representations and promises, engaged in a scheme constituting a systematic ongoing course of conduct and so obtained property with a value in excess of one thousand dollars, to wit, approvals, charters and licenses from state and federal bank regulators to manage and control banks, banking institutions and bank holding companies and deposits and credit from persons doing business with such banks.”
Altman is moving to dismiss this count on several grounds: that what he obtained was not "property”; if it were "property,” it did not come from those defrauded; this count is both time barred and constitutes an ex post facto prosecution; the indictment charges defendants with "obtaining and maintaining” property in an effort by the People to evade statutory requirements; the charge fails to allege multiple victims. The indictment charges that the defendants obtained two kinds of property: bank licenses and charters from regulators and deposits and credits from customers. Altman contends that bank licenses and charters are not "property” within the meaning of the statute.
Contending that licenses, charters and approvals are not property, Altman also makes the related but different argument that whether the licenses are property in the hands of the licensees or not, before they are issued they are but symbolic expressions of the government’s power and do not constitute property under the scheme to defraud statute. He argues that the defendant must have obtained "property” to commit the crime. Since the licenses were not property until issued, while the defendants may have caused the government to exercise its power, they did not take its property.
The question is whether bank licenses, charters and approvals are "property” within the meaning of this section. This section is apparently modelled on the Federal mail fraud statute. Accordingly, Federal law is often referred to in construing the scheme to defraud statute. Until 1987, there seems to have been little doubt that intangible rights such as licenses were property. In that year, the United States Supreme Court decided the case of McNally v United States (483 US 350), which rejected the "intangible rights” (at 355) theory as a basis for mail fraud prosecutions brought by the Federal Government against corrupt State and local officials. McNally *911 held that the intangible right to good government is not "property”, but offered no insight as to the types of interests which might be deemed property in the hands of the Government for purposes of the mail fraud statute. Subsequent cases have split on the question of whether intangible rights are property. In United States v Bucuvalas (970 F2d 937, cert denied — US —, 113 S Ct 1382), the defendants submitted false information to licensing authorities to obtain alcoholic beverage licenses. The United States Court of Appeals after a detailed discussion of McNally and its progeny concluded that the licenses were property. Although New York’s scheme to defraud statute is modelled on the Federal mail fraud statute causing Federal cases to be persuasive in its interpretation, the New York courts are not bound by the Federal interpretations. New York courts have also dealt with the question of whether intangible rights are property. Generally the answer has been in the affirmative. For example, the New York Court of Appeals in People v Garland (69 NY2d 144) held that tenants who have a legal right to occupy and possess an apartment, whether by lease or under statute, own "property” as defined by the larceny sections of the Penal Law. In the instant case, in addition to the intangible property rights Altman obtained from regulators he also received deposits and credits made and extended by those who did business with FABNY.
Admitting, as he must, that deposits are "property”, Altman contends that these deposits and credits were not obtained from persons who were defrauded by the defendants. Altman cites, in support of his position, People v Mikuszewski (73 NY2d 407). But this case does not help him. In Mikuszewski, the defendant was indicted for scheme to defraud for a scheme involving false documents used in an effort to feign compliance with minority business participation requirements in two public works contracts. The Court of Appeals upheld dismissal of this charge because while the People’s evidence may have been sufficient to show that the defendant had defrauded the government there was absolutely no evidence that the defendant had made false representations to the other contractors. However, the instant case is clearly distinguishable. In Mikuszewski, the other contractors may have lost contracts because the defendant cheated in the bidding process, but they did not rely in any way on the defendant’s representations. They were not defrauded by him. Very different is the instant case. Here, because the defendants obtained *912 bank licenses by their false and fraudulent representations, the customers of the defendants’ banks were induced to make their deposits and extend credit. The defendants’ false representations, therefore, contributed directly to their obtaining property from the customers of their banks.
Altman asserts that this count is both time barred and subjects Altman to ex post facto prosecution. To "camouflage” these hurdles, the prosecutor has made an ad hoc amendment of the statute. The statute refers to "obtaining” property. The indictment tracks this language. It also goes on, however, to spell out the scheme in some detail. On the fourth page of the count, the indictment charges: "[b]y means of this fraudulent conduct, the defendants and [two others] obtained and maintained property in the form of licenses”.
The scheme to defraud statute was enacted in 1976 as a misdemeanor. In 1986, it was amended so that scheme to defraud in the first degree under the circumstances of this indictment is now a felony (Penal Law § 190.65). For a defendant to be validly charged under this section, it is necessary that the felony be committed both within the five years before the filing of the indictment and since the amending of the statute to raise it to a felony. Scheme to defraud is generally not a crime that begins and ends of a certain day. It is often committed over an extensive period of time. In the instant case, it is charged that the crime was committed over a period of 14 years. Some of this 14-year period was before the statute was amended and some after.
Scheme to defraud, although a continuing crime in some senses, is not, like offenses such as bail jumping (People v Ingram, 74 Misc 2d 635), an offense that continues without further acts by the defendant. Rather, it consists of the various acts such as obtaining property. For the crime charged to come within the Statute of Limitations, it is necessary that the last larcenous act occur within five years. So that the crime charged will not violate the ex post facto provisions of the Federal Constitution, it is necessary that a larcenous act occur after the amendment of the statute to make the crime a felony (of course, under the facts of this case satisfying the Statute of Limitations also satisfies the ex post facto provisions).
Altman argues that, even if the licenses are regarded as property, they were obtained before the five-year limiting period and before the statute was amended. The word "main *913 tained”, he says, was inserted into the indictment in a misguided prosecutorial attempt to salvage the case by broadening the statute so that instead of proving the licenses were obtained within the limiting period the People can merely show they were maintained during that period. The contested word "maintained” was not included in the charge to the Grand Jury. Further, the People presented evidence to the effect that licenses were obtained within the five-year limiting period. This court will not speculate as to the reasons the word "maintained” appears in the indictment. It is clear that to come within the statute, the People must prove the defendant "obtained property” within five years before the filing of the indictment. Obtaining a license would qualify. So, perhaps, under the right circumstances would obtaining a renewal of a license.
The word "maintained” is stricken as the surplusage it clearly is.
Finally, Altman asserts that the scheme to defraud count fails to allege multiple victims. Suffice it to say that the count alleges victims, "to wit, state and federal bank regulators and persons doing business with banks”.
COMMERCIAL BRIBE RECEIVING
Altman seeks dismissal of the fifth count of the indictment in which he is charged with commercial bribe receiving in the first degree (Penal Law § 180.08). That section provides: "An employee, agent or fiduciary is guilty of commercial bribe receiving in the first degree when, without the consent of his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer’s or principal’s affairs, and the value of the benefit solicited, accepted or agreed to be accepted exceeds one thousand dollars and causes economic harm to the employer or principal in an amount exceeding two hundred fifty dollars.”
Altman first points out that the indictment contains the words "lawful consent” instead of just "consent”. The addition of the word "lawful”, he contends, means that the District Attorney was unable to establish lack of consent and so added the requirement that the consent be "lawful”. The court has read the Grand Jury minutes including the District Attorney’s instructions. It is clear that these instructions meet the stan *914 dards set by the Court of Appeals. (People v Calbud, Inc., 49 NY2d 389.) Although the word "lawful” is contained in the indictment, it was not included in the instructions to the Grand Jury, which was properly instructed. The word "lawful” should be stricken from the indictment.
Altman also seeks dismissal of this count, claiming that in fact his "employer or principal” consented to his receipt of the "benefit” which he is charged with receiving. He has attached to the memorandum in support of this motion a copy of a resolution of the Board of Directors of CCAH authorizing sale of stock. While Altman eventually sold some of this stock there is nothing in this resolution that indicates that his employer or principal consented to his receiving a benefit. The indictment specifies that the employers and principals that failed to give their consent, "lawful” or otherwise, were CCAH and three subsidiary bank holding corporations. There is no evidence in the Grand Jury minutes that these corporations gave any consent to the transaction that gave rise to the charge in this count.
CONSPIRACY
Altman is moving to dismiss the conspiracy count asserting that the alleged conspiracy is limited to the four defendants named in the count and that defendants charged with completed crimes of bribery or bribe receiving may not also be charged with conspiracy to commit those crimes. In support of his position, Altman cites a Federal case, United States v Sager (49 F2d 725, 728 [2d Cir 1931]).
Defendant’s argument fails because of several weaknesses. First, in Sager (supra), the bribe givers and bribe receivers were the only parties to the conspiracy. Here the indictment specifically states that the alleged coconspirators "did agree with one and more persons”. Other parts of the count indicate further that others were to be involved than the four conspirators.
Second, the conspiracy count alleges events over a longer time span than the commercial bribing and bribe receiving counts. Specifically, the conspiracy count covers a period from October 3, 1980, to July 22, 1992, whereas the commercial bribe receiving count merely covers the period from September 1985, to July 22, 1992.
Third, the commercial bribe receiving count alleges a bribe in the form of an opportunity to purchase and sell stock on *915 favorable conditions coupled with nonrecourse loans. The conspiracy count not only refers to loans and stock transactions but also to bribes in the form of "legal fees”.
Finally, and perhaps most importantly, New York does not follow Sager (supra). In New York, "[t]he crime of conspiracy is an offense separate from the crime that is the object of the conspiracy” (People v McGee, 49 NY2d 48, 57, cert denied sub nom. Waters v New York, 446 US 942). In New York, a defendant may be charged with both conspiracy and substantive bribery counts. (See, People v Sanders, 56 NY2d 51, rearg denied 57 NY2d 674; People v Manfredi, 166 AD2d 460, lv denied 76 NY2d 1022; People v Koopalethes, 166 AD2d 458, lv denied 76 NY2d 1022; People v McGee, supra [wherein the convictions of McGee’s codefendants of both bribery and conspiracy were upheld].) Although in none of these cases was the issue of the propriety of charging both conspiracy and bribery specifically litigated, the courts seem to have taken for granted that charging both crimes is proper.
Altman is also seeking dismissal of this count claiming that the Statute of Limitations has run. The conspiracy count charges a misdemeanor. The Statute of Limitations for a misdemeanor is two years. (CPL 30.10 [2] [c].) In New York, the crime of conspiracy is basically the agreement to commit a crime coupled with an overt act which is a step to the carrying out of that agreement. To come within the two-year period the indictment must allege an overt act that took place within the two-year period. (See, People v Hines, 284 NY 93.)
Of the 100 overt acts set forth in the indictment, seven allege dates within the two years. Altman asserts that all are either legally insufficient or defective. The seven overt acts fall into two categories. The first category, which consists of counts 56, 58 and 94, is made up of allegations that Clifford and Altman omitted to do something. The second category consists of allegations that Clifford and Altman caused bills for legal fees to be sent over a period of time.
As to the first category, the omissions, Altman is arguing that an omission is not an act. He contends that overt acts are required "to show that an affirmative step has been taken marking the advancement of the criminal plan into action. A failure to volunteer information about acts is not itself an act”. The People, on the other hand, citing the statutory definition of an act (Penal Law § 15.00 [5]) contend that an omission can be an overt act. Reliance on the definition is of *916 dubious help to them, however, since a related definition reads " 'Act’ means a bodily movement”. (Penal Law § 15.00 [1].)
There would seem to be no reason why an omission in the appropriate circumstances could not be an overt act. Filing a form with crucial information omitted might be such an overt act. But in general simply not doing something would not seem to qualify as an overt act Certainly, since the purpose of requiring pleading and proof of overt acts is to show that a conspiracy has moved beyond the talk stage and is being carried out, alleging failure to act as an overt act seems to be a contradiction in terms. The overt acts alleged in the instant indictment consist of failing to inform an allied attorney over a period of five years of the means by which CCAH stock was purchased; failure by two of the defendants to inform their law partners over the same period of the means by which the stock was purchased; and, when informing an auditor of loans, failing to mention their nonrecourse nature. None of these omissions seem to this court to be overt acts.
At the oral argument, the District Attorney cited several authorities. The most pertinent were 2 LaFave and Scott, Substantive Criminal Law (1986) and Gerson v United States (25 F2d 49). LaFave and Scott does indeed say "[t]he overt act requirement may be satisfied by an omission” (at 96), however, the text relies on Gerson. In Gerson, the overt act in question consisted of failing to list assets on a bankruptcy petition. Here there was not so much an omission, but an act, namely, filing an incomplete petition. This is quite different from the supposed overt acts in the instant case.
The other four overt acts do indeed allege acts, specifically, each overt act states that over a period of time the defendants Clifford and Altman caused their law firm to bill a client for legal fees. Each overt act alleges a different client. Since each overt act alleges bills in a total amount it is clear that each is referring to several bills sent within the time period. Altman asserts that these overt acts are duplicitous in that each encompasses multiple acts or omissions. The People respond that this argument is misguided. All overt acts take place over a period of time, they say. They suggest that an act such as a telephone conversation or a trip takes place over a period of time and that each can be broken down into component parts.
An overt act, like a count in an indictment, should allege a single act. Where a single charge alleges the commission of a *917 criminal act occurring repeatedly over a period of time, that charge relieves the jury from having to reach a unanimous verdict as to a single offense and is improperly duplicitous. (People v Keindl, 68 NY2d 410, 417-418, rearg denied 69 NY2d 823.) The same is true of an overt act. Clearly the overt acts in this indictment are referring to separate bills rendered at different times during the period set forth in the overt act. The jury could find, for instance, that bills had been rendered, under overt act 100, and that the overt act has been proved even though the most recent bill that they believed to have been sent was not within the two-year limiting period. The analogy to a telephone call, even one long enough to be both within and without the limiting period, is false. A telephone call is but a single act. Dividing it, somehow, does not make it several acts. Had the overt act alleged, for instance, the sending of only one bill during the period set forth in the overt act, the overt act would have been sufficiently alleged. It would then have been incumbent on the People to prove at trial that the bill was sent within the two-year limiting period.
Since none of the overt acts that purport to come within the two-year period are proper, the count is not within the Statute of Limitations. It is, therefore, dismissed.
BUSINESS RECORDS
Defendant Altman alone is charged in six counts of the indictment with crimes relating to keeping and filing Federal Reserve forms entitled Annual Report of Bank Holding Companies Y-6. In counts six, seven and eight he is charged with falsifying business records in the first degree (Penal Law § 175.10). In counts 9, 10 and 11, he is charged with offering a false instrument for filing in the first degree (Penal Law § 175.35).
Counts six through eight charge, in part, that the defendant "with intent to defraud and to commit another crime and to aid and conceal the commission of another crime, to wit, Scheme to Defraud in the First Degree and criminal violations of the Banking Law, omitted to make a true entry in the business records of an enterprise, to wit, Credit and Commerce American Holdings, N.A., and its subsidiaries and affiliates * * * in that he omitted to make a true entry in the Federal Reserve form Y-6 of CCAH.”
Altman claims that the forms Y-6 were not "business *918 records”. Penal Law § 175.00 (2) contains this definition: " 'Business record’ means any writing or article * * * kept or maintained by an enterprise for the purpose of evidencing or reflecting its condition or activity”.
The forms Y-6 were created as a result of Federal Reserve Regulation Y. Bank holding companies are required to file these forms as annual reports with the Board annually. The New York State Banking Department also requires banks to file an annual report. However, the State regulation does not require the reports to be filed by banks that are wholly owned by a bank holding company. Instead, the State Banking Department directive says "it would be appreciated if such institutions forwarded three copies of their and/or their parent’s annual report”.
Each of the three years in question, Altman prepared, or caused to be prepared, and signed the Y-6 for that year. Each year the Y-6 was sent to the New York State Banking Department by an attorney in a law firm that was handling banking matters for CCAH. The People assert that this attorney acted on Altman’s behalf and as his agent.
The first issue raised by counts six through eight is whether the Y-6’s are business records. The question is whether forms prepared by an enterprise to report to a government agency are "business records.” In People v Davis (49 NY2d 910), the Genesee County Automobile Bureau was required to prepare forms to account for missing or mutilated registration plates or validation stickers and to account for transactions taking place at the Genesee Bureau. The forms were then forwarded to the New York State Department of Motor Vehicles. The Court of Appeals, in upholding the conviction of an employee of the Genesee Bureau for falsifying business records, stated "[a]t the time defendant prepared the documents they were in the Genesee office. The fact that they were thereafter transferred to the department does not make them any the less writings maintained for the purpose of reflecting the activity of the Genesee Bureau” (at 912). The documents were therefore business records of the Genesee Bureau. In the instant case, the Y-6’s were prepared to be filed with the Federal Reserve Board and the New York State Banking Department. It is clear that they were "business records”.
A similar result was obtained in People v DeLuca (178 AD2d 426, lv denied 79 NY2d 826) in which various receipts for *919 purchases of automobile parts from defendant by undercover officers were found to be "business records”. The Appellate Division held that: "Inasmuch as a duty is imposed on the defendants by the New York State Tax Law to maintain a true copy of each sales invoice for sales tax purposes * * * and the trial evidence supported the conclusion that the defendants retained carbon copies of the receipts given to customers for record-keeping purposes, we conclude that the receipts constituted business records within the meaning of the statute” (at 427).
Altman relies on People v Bel Air Equip. Corp. (46 AD2d 773, affd 39 NY2d 48). In that case, defendants, who were paid by the New York State Department of Transportation for moving condemned property, submitted padded vouchers while keeping a duplicate set. The Appellate Division held that "the maintenance by defendants in their records of a duplicate set of the padded vouchers does not support their conviction of the crime of falsifying business records in the first degree. The proof does not establish that the duplicates were 'kept or maintained’ by defendants 'for the purpose of evidencing or reflecting its condition or activity’ * * * No false entry was made in any business journal or book of account. The duplicate vouchers were not made for record keeping purposes or to reflect defendant’s condition or activity. They were in effect, duplicates of a bill prepared at the request of the customer” (at 774).
In the instant case, the Y-6’s were required to be prepared by law as the forms themselves so state at the top of the first page. They were annual reports designed to show the condition of the bank holding company and its subsidiaries. Certainly, they seem more analogous to the reports in Davis (supra) or the documents maintained at the direction of the State Tax Department in DeLuca (supra) than to the padded vouchers in Bel Air (supra). The court concludes that the Y-6’s were "business records” of CCAH.
The People have suggested that by submitting the Y-6 forms to the New York State Banking Department, the documents became "business records” of that "enterprise”. This is no doubt true. Certainly, this theory would dispose of the problem created by the decision in Bel Air (supra). (See, People v Weinfeld, 65 AD2d 911.) However, the indictment charges that the Y-6’s were "business records of CCAH and its subsidiaries and affiliates”. It does not charge that they were business records of the New York State Banking Department.
*920 Counts six through eight allege in part that Altman committed the crime of falsifying business records "to commit another crime and to aid and conceal the commission of another crime, to wit, Scheme to Defraud in the First Degree and criminal violations of the Banking Law”. By letter response to the defendant’s demand for a bill of particulars, the District Attorney particularized the charge, saying: "Defendant Altman intended to commit and to conceal violations of, among others, Sections 145, 200, 201, 672, and 673 of the New York State Banking Law”.
Altman contends he could not have committed the violations as a matter of law. The People, in response, concede that the references to sections 200 and 201 of the Banking Law are erroneous since violations of those provisions would not form discrete crimes under the Banking Law. On the other hand, they seek to add to their particulars a violation of Banking Law § 143-b which is made a crime by Banking Law § 145. Altman asserts that Banking Law § 145 does not apply to CCAH since CCAH is not a "bank holding company” within the meaning of the New York Banking Law (which requires that a company hold two banks with their main offices in New York to be a "bank holding company” whereas CCAH held but one such bank). However, Banking Law §§ 143-b and 145 both prohibit acts by a "company” and not by a "bank holding company”, so that they do apply to CCAH.
Altman also asserts that these various sections of the Banking Law are preempted by Federal law. However, that position is without merit, as discussed above.
FILING FALSE RECORDS
Counts 9 through 11 of the indictment charge Altman with the crime of offering a false instrument for filing in the first degree. Specifically, these counts charge that Altman "with intent to defraud the state and a political subdivision thereof, offered and presented a written instrument, to wit, a copy of Federal Reserve form Y-6 for [CCAH] containing a false statement and false information to a public office, to wit, the New York State Banking Department with the knowledge and belief that it would be filed with, registered and recorded in, and otherwise become a part of the records of the New York State Banking Department”.
Altman seeks dismissal of these counts on several grounds. He claims that there is no requirement that the Y-6’s be filed *921 with the New York State Banking Department; that he did not know or authorize them to be sent and that they contained no false statements. It is clear that the Y-6’s were in fact sent to the State Banking Department. The covering letters, which are attached as exhibits to Altman’s reply brief, request: "Please acknowledge receipt of this filing”. Altman cites a recent circular of the Banking Department which requires filings of annual reports by banks. The circular excepts banks held by "holding companies” from this requirement but adds that "it would be appreciated if such institutions forwarded three copies of their and/or their parent’s annual report”. Since CCAH is not a bank holding company under New York law, it is doubtful that it comes within the exception. In any case, whether required or not, the Y-6’s were filed.
Altman also claims that he neither knew nor authorized the filing of these documents. However, he, his law firm or CCAH or its subsidiaries did retain the firm that filed the Y-6’s. Altman signed them and cannot now claim unawareness that this firm would file them not only with the Federal Reserve Board but also with the various State banking departments that require or would appreciate such reports.
Finally, Altman claims that these Y-6’s did not contain any false statements or false information. The People assert that these forms were falsified by the omission of information about the role of BCCI and Altman’s voting control of CCAH. Certainly, failure to disclose BCCI’s role and the ownership and control of First American Bank of New York and its parent companies defeated the efforts of the regulators to keep BCCI from control of banks in New York. A person who files a false statement for the purpose of frustrating the State’s regulatory power violates the statute. (People v Kase, 76 AD2d 532, affd 53 NY2d 989.) An omission of income in an application for recertification for public assistance benefits by one who "forgot” about it has also been held to violate the statute. (People v Bentley, 106 AD2d 825.) The Y-6’s in the instant case violate the statute also.
GEOGRAPHICAL JURISDICTION
Altman is also moving to dismiss the counts of commercial bribe receiving and falsifying business records on the grounds that the District Attorney does not have geographical jurisdiction over them.
*922 CPL 20.20 provides in part:
"[A] person may be convicted in the criminal courts of this state of an offense defined by the laws of this state, committed either by his own conduct or by the conduct of another for which he is legally accountable pursuant to section 20.00 of the penal law, when:
"1. Conduct occurred within this state sufficient to establish * * *
"(c) A conspiracy * * * to commit such offense * * * provided that the jurisdiction accorded by this paragraph extends only to conviction of those persons whose conspiratorial or other conduct of complicity occurred within this state; or
"2. Even though none of the conduct constituting such offense may have occurred within this state * * *
"(b) The statute defining the offense is designed to prevent the occurrence of a particular effect in this state and the conduct constituting the offense committed was performed with intent that it would have such effect herein.”
CPL 20.10 provides in part:
"The following definitions are applicable to this article * * *
"4. 'Particular effect of an offense.’ When conduct constituting an offense produces consequences which, though not necessarily amounting to a result or element of such offense * * * result in the defrauding of persons in [a particular] jurisdiction, such conduct and offense have a 'particular effect’ upon such jurisdiction.”
As discussed above, the crime of falsifying business records was committed by omitting material information in the Y-6’s. These documents were created by law to be filed with the Federal Reserve Board. They also were used for filing with the New York State Banking Department. This latter filing resulted in the defrauding both of the regulators who had their office in New York County and subsequently of the depositors who put their money in branches located in New York County. Altman claims that, at most, such filing constituted the separate crime of offering a false instrument for filing and that the crime of falsification of business records was wholly committed outside New York County. Putting aside that copies of these documents may well have been kept at the head office of First American Bank of New York which is located in New York County, their creation resulted in consequences in New York County. That another crime was *923 also committed does not prevent the falsification itself from being a New York County crime.
The indictment charges not only the crime of commercial bribe receiving but also the crime of conspiracy to commit the crime of commercial bribe receiving. The overt acts listed in the conspiracy charge show that crime is subject to New York County’s jurisdiction. (That the conspiracy charge is time barred has no effect on its role in establishing geographical jurisdiction of the substantive offense.)
New York County has geographical jurisdiction of the offenses charged in this indictment.
STATEMENT NOTICE
Altman was arraigned on July 29, 1992. Thereafter, the People served a document entitled "statement notice” dated August 11, 1992. This document asserts that the defendant has made numerous statements to State and Federal authorities relating to the acquisition and management of First American Bankshares and related entities. The document further states that it is the People’s position that all such statements were part of the res gestae of the crimes charged in the indictment and therefore CPL 710.30 does not require the giving of notice with regard to these statements. The document then advises the defendant in general terms that the People intend to offer evidence of statements. The statements are then listed without any specifics as to time, place or to whom, but generally, for example: "statements made to the Congress of the United States and its committees and staff.”
Altman is now moving to preclude use of these statements on the ground that the notice failed to "specify” them. Apparently, anticipating attempts by the People to supplement this statement, Altman also asserts that the People must serve the notice within 15 days of arraignment and may not use material turned over as discovery material but not in connection with a CPL 710.30 statement to save an otherwise inadequate statement.
CPL 710.30 provides: "1. Whenever the people intend to offer at a trial (a) evidence of a statement made by a defendant to a public servant, which statement if involuntarily made would render the evidence thereof suppressible upon motion pursuant to subdivision three of section 710.20 * * * they must serve upon the defendant a notice of such intention, specifying the evidence intended to be offered.”
*924 It is quite clear that the “statement notice” does not specify the evidence intended to be offered. That many of the statements have been turned over to the defendant, perhaps even within the 15-day period, does not help the People. In People v Phillips (NYLJ, May 27, 1992, at 28, col 3 [2d Dept 1992]), the People turned over a voluntary disclosure form (VDF) which contained a statement notice. At the same time, the People turned over police reports which contained another statement not contained in the statement notice. The Appellate Division held that the trial court’s ruling admitting the latter statement was error since the VDF did not notify the defendant that the People intended to use it on their direct case. The "statement notice” served in this case is insufficiently specific to serve the purpose.
Although the People served this notice, they claim both in the notice and in their brief that the notice was unnecessary as all the statements were part of the res gestae, that is they were made in the commission of the crimes charged in the indictment. The People are correct in this position since "[w]hen there is no question as to the voluntariness of a defendant’s statements * * * as in the case of res gestae statements, notice to the defendant of the intention to offer such statements into evidence is not required.” (People v Wells, 133 AD2d 385, 386, lv denied 70 NY2d 939; People v Early, 85 AD2d 752.)
Use by the People of any statements by the defendant on their direct case is precluded, except as to those statements made in furtherance of one of the crimes charged in the indictment, namely, the res gestae statements.
INSPECTION AND DISCOVERY
In addition to the arguments discussed above, Altman has requested the court to review the Grand Jury minutes to ensure that the proceedings were properly conducted. He asks the court to review the instructions on the law, compliance with quorum and voting requirements and other potential irregularities. He also asks for release of the District Attorney’s instructions on the law. The court has reviewed the 9,500 pages of testimony and legal instructions. Having done so, the court is convinced that legally sufficient evidence was presented to support the charges in the indictment and that the proceedings were properly conducted in conformity with the law.
*925 Altman is also seeking a bill of particulars and discovery and the People have cross-moved for certain discovery clarifications. While this decision was being written, the court has had a number of conferences with the attorneys and has issued oral directives. This decision will not cover the same ground.
CONCLUSION
The motion is granted to the extent that the second count of the indictment is dismissed, the People are precluded from using certain statements on their direct case, the words "maintained” and "lawful” are stricken from the first and fifth counts respectively. The motion is in all other respects denied.